IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

EMPLOYERS MUTUAL CASUALTY )
COMPANY, an insurance company )
incorporated and domiciled in the State )
of Iowa, )
)
     Plaintiff, )
)
v. )  No. CIV-07-917-C
)
LARRY GRAYSON d/b/a SOUTHWEST )
READY MIX and J.C. GRAYSON d/b/a )
SOUTHWEST READY MIX, )
)
     Defendants. )

## MEMORANDUM OPINION & ORDER

Plaintiff Employers Mutual Casualty Company ("EMC") seeks a declaratory judgment

that its general liability insurance contract with Defendants Larry Grayson and J.C. Grayson

d/b/a Southwest Ready Mix ("Ready Mix") does not cover damages resulting from Ready

Mix's delivery of defective concrete to a bridge construction project.   Ready Mix

counterclaimed for $245,000 as damages allegedly resulting from EMC's failure to pay its

claim for losses incurred as a result of supplying defective concrete.   EMC has moved for

summary judgment.   Response and reply briefs were filed.

### STANDARD

Summary judgment is proper only if the moving party shows "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  The Court views the evidence and draws all reasonable

inference therefrom in the light most favorable to the nonmoving party.  Byers v. City of

Albuquerque, 150 F.3d 1271, 1274 (10th Cir. 1998).  A dispute regarding the interpretation

of an insurance contract may be resolved at summary judgment if the Court finds, as a matter

of law, that the language is unambiguous or, if ambiguous, there is no genuine issue of

material fact in dispute as to the parties' intent.  See Gomez v. Am. Elec. Power Serv. Corp.,

726 F.2d 649, 651 (10th Cir. 1984).

> In Oklahoma, unambiguous insurance contracts are construed, as are other contracts, according to their terms.  The interpretation of an insurance contract and whether it is ambiguous is determined by the court as a matter of law.  Insurance contracts are ambiguous only if they are susceptible to two constructions. . . .
>
> If a contract is ambiguous, the trial court may admit parol evidence to aid in interpretation.  Generally, the issue to which parol evidence has been admitted becomes "a mixed question of law and fact to be determined by the trier thereof, whether court or jury."  Nonetheless, a trial court may consider parol evidence in making its summary judgment ruling if the movant properly submits the evidence along with [its] motion.

Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 740 (10th Cir. 2004) (citations

omitted).

## FACTS

The facts are largely undisputed.  Ready Mix contracted to provide concrete for a new

bridge construction site located six miles east of Anadarko, Oklahoma, on State Highway 62.

Ready Mix mixed, transported, and delivered the concrete to the new bridge site.  The bridge

structure, forms for the concrete, metal work (including reinforcement steel rebars and joint

expansions), and all associated labor to build the bridge were provided or performed by

contractors or subcontractors other than Ready Mix.

The concrete came from three bins located at Ready Mix's Fletcher, Oklahoma, facility.  One or more of those bins contained fly ash or a fly ash mixture.  Fly ash is "fine solid particles of ashes, dust, and soot carried out from burning fuel (as coal or oil) by the draft."  Merriam-Webster's Online Dictionary, http://medical.merriam-webster.com (2008).  A class of fly ash may be used to supplement or replace Portland cement in concrete production.  Id.  The parties agree that the fly ash in the concrete supplied by Ready Mix prevented it from meeting or exceeding the contract specifications.  Specifically, the presence of the fly ash prevented the concrete from hardening properly and resulted in loose rebars, cracking of the bridge deck, and concrete discoloration.  As a result, the bridge was unusable or unfit for its intended purpose.

Repairing the bridge deck required removing the deck; replacing concrete rails, rebar, concrete, and an expansion joint; and "remobilization."  (Dkt. No. 19, Pl.'s Br. Ex. 1.)  Ready Mix supplied the new concrete and paid for the required replacement materials and labor.  It then made demand for reimbursement on EMC, its insurance carrier, under its general commercial liability policy.

## DISCUSSION

EMC asserts three reasons why Ready Mix's claim is not covered:  (1) the damages claimed were not the result of an "occurrence;"  (2) coverage is excluded under the "Your product" exclusion ("Exclusion k");  and (3) coverage is excluded under the "Damage to Impaired Property or Property Not Physically Injured" exclusion ("Exclusion m").  As an alternative to summary judgment in its favor, EMC asks that the Court limit the amount and

items in dispute.  (Pl.'s Br. at 3.)  Ready Mix makes clear in its Response that it only seeks to recover what it had to pay to replace the property and work of others, i.e., the concrete rails, expansion joint, and rebar, that were destroyed when the defective concrete was removed.  (Dkt. No. 22, Defs.' Resp. at 8.)

Ready Mix's commercial general liability insurance policy provides coverage for sums Ready Mix becomes legally obligated to pay as damages because of "bodily injury" or "property damage" caused by an "occurrence" during the policy period.  (Pls.' Br. Ex. 2, CGL policy.)  "Property damage" includes "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured."  "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The two exclusions identified by EMC as applicable here are k and m.  Exclusion k excludes coverage for property damage to "your product."  "Your product" includes "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" you, Ready Mix.  Exclusion m applies to "impaired property," which is:

> tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
> a.  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
> b.  You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:
> a.  The repair, replacement, adjustment or removal of "your product" or "your work"; or
> b.  Your fulfilling the terms of the contract or agreement.

Under Exclusion m, the insurance does not apply to:

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of :
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

The parties agree that Oklahoma law applies to the coverage determination involved here.  Accordingly, the Court construes Ready Mix's insurance policy as a matter of law, seeking to give effect to all of its provisions, if possible, and interpreting unambiguous terms in their plain and ordinary sense.  Dodson v. St. Paul Ins. Co., 1991 OK 24, 812 P.2d 372, 376.

> The general declaration of insurance coverage, as established by the insurance policy and limited by its provisions, normally determines the insurance carrier's liability, and the insured's respective rights under the contract by identifying what risks are covered and excluded by the policy.  The policy exclusions are read seriatim; each exclusion eliminates coverage and operates independently against the general declaration of insurance coverage and all prior exclusions by specifying other occurrences not covered by the policy.  Thus, subsequent exclusions can further limit or even remove a covered risk from the general declaration of insurance coverage.  In case of doubt, exclusions exempting certain specified risks are construed strictly against the insurer.

Id., 1991 OK 24, ¶ 13, 812 P.2d 372, 377 (footnotes omitted).[1]

---

[1] Ready Mix argues that EMC's prior decision to pay a similar claim is relevant here, either as estoppel or "as evidence as to the reasonable meaning of the policy language." (Defs.' Resp. at 5.)  EMC strongly objects to any consideration of that claim in this case, in part because the facts are distinguishable.  The Court agrees that to the extent Ready Mix might argue that EMC's prior treatment of a similar claim constrains or modifies its obligations in this case, such an argument is

A comprehensive general liability policy . . . "is a standardized liability policy promulgated by a group of organizations including the United States's leading insurance companies." The standard policy provisions were revised [a number of times in preceding years]. Because of these revisions in policy language, and because a particular policy may deviate from the language of the standard form, cases construing policy coverage are not authoritative if they do not involve the same language or the same version of the standard form embodied in the policy under consideration.

Hartford Accident & Indem. Co. v. Pac. Mut. Life Ins. Co., 861 F.2d 250, 252 (10th Cir. 1988) (citations omitted).

### 1.    "Occurrence"

EMC first argues that there is no coverage because the property damage in this case did not result from an occurrence, in the sense of an accident, but instead because of the deliberate and intentional decision to tear out the defective concrete. EMC relies on Bright Wood Corp. v. Bankers Standard Ins. Co., 665 N.W. 2d 544, 548-49 (Minn. Ct. App. 2003), for support. In that case, Bright Wood supplied a window manufacturer with the wood components that surround the glass in a window sash. The wood components did not conform to contract specifications because they were not treated with wood preservative to prevent rot. To replace the defective wood sash components, other non-Bright Wood window components were necessarily damaged. A technician had to remove weather stripping, hardware, and aluminum cladding and the windows had to be refinished. In a

---

not supported in the record. Nor is that evidence necessarily indicative of how the policy provisions in play here should be construed. Therefore, the Court does not consider that evidence in reaching the conclusions detailed below.

In addition, the Court does not consider the opinion of Ready Mix's expert, Phil Combs, which is the subject of a pending motion to exclude (see Dkt. No. 16.) EMC raises serious questions about Mr. Combs's qualifications and the admissibility of his testimony, which need not be resolved because his opinions are not necessary to a summary judgment decision on coverage.

discussion of the "your product" exclusion, the court referred to the "occurrence" limitation on the scope of coverage:

> This interpretation [excluding incidental damage to other components resulting from the repair of a defective product] is consistent with the general scope of the commercial general liability policy. These policies are intended to cover damage arising out of an "occurrence," which is defined in both policies as "an accident" and damage "not expected or intended" by the insured. Here, the damage to other property occurred because of repairs deliberately undertaken. The resulting damage is not an accidental occurrence.

665 N.W.2d at 549.

Despite its unequivocal statement of law, the Bright Wood "occurrence" analysis is not determinative here. For one thing: "The 'deliberateness' of the act that results in property damage is not the important point. What is important is whether the damage resulting from the deliberate act was intended or expected." 4 Philip L. Bruner & Patrick J. O'Connor, Jr., Bruner and O'Connor on Construction Law, § 11:45 n.10 (2008). And for another, the Bright Wood supplier had learned that components were not being treated and simply began treating subsequent components without alerting its customer, the window manufacturer, to the problem. Thus, the ensuing window repair process was more expansive than necessary because the manufacturer could not identify which components had been treated and which had not. Accordingly, a deliberate act, concealing the defect, was interjected between the accidental failure to treat components and the subsequent discovery and repair. Such facts and attendant difficulties in parsing damages are not present here.

The Bright Wood holding also does not square with Oklahoma case law. More than half a century ago, the Oklahoma Supreme Court explored the meaning of the term

"accident" in an insurance policy.  See United States Fidelity & Guar. Co. v. Briscoe, 1951 OK 386, 239 P.2d 754 (Okla.1951).  The Court found it "well settled" that "the words, 'accident' and 'accidental' have never acquired any technical meaning in law, and when used in an insurance contract, they are to be construed and considered according to common speech and common usage of people generally." Id. at ¶ 10, 756.  The court concluded that "if [a] contractor performs or does a voluntary act, the natural, usual and to-be-expected result of which is to bring injury or damage upon himself, then resulting damage, so occurring, is not an accident in any sense of the word, legal or colloquial." Id. at ¶ 11, 757.

In contrast, damages may be the product of an accident even if due to the insured's negligence.  In Penley v. Gulf Ins. Co., 1966 OK 84, 414 P.2d 305, the Oklahoma Supreme Court rejected an insurer's argument that damages resulting from the insured's employee negligently placing gasoline instead of diesel fuel in the motor grader were not covered as "accidental."  Quoting from another jurisdiction, the court explained, "'Simply because the damage resulted from negligence, a concept which carries with it the element of foreseeability, does not deprive the occurrence of its accidental nature.'" Id. at ¶ 19, 308 (citation omitted).

Here, it is undisputed that Ready Mix did not knowingly deliver concrete containing fly ash.  Nor is there any suggestion that a reasonable supplier in its position would have known the concrete contained fly ash or was otherwise non-conforming.  Thus, the damage to the bridge deck and to its structural components during the required removal of the defective concrete was the unintended consequence of Ready Mix innocently supplying a

non-conforming product.  That the repair necessitated by the non-conforming product was intentional and deliberate does not remove those damages from the scope of coverage.

This conclusion is further supported by the policy itself, which defines property damage to include the loss of use of tangible property that is not physically injured.  The loss of use is deemed to have occurred at the time of the "occurrence" that caused it.  Here, the addition of defective concrete effectively negated the usefulness of other component parts of the bridge deck.  In other words, the loss of use qualifying as "property damage" for which Ready Mix was insured occurred when the defective concrete was added to the bridge.

Thus, EMC's deliberate-act-of-repair argument fails because inadvertently supplying a defective product was an "occurrence" within the clear meaning of the policy.

### 2.      "Your Product" Exclusion: Exclusion k

EMC also argues that the "your product" exclusion excludes property damages to Ready Mix's non-conforming concrete and related repair costs.  EMC contends that the exclusion excludes the concrete, concrete rails, and associated labor.  (Pl.'s Br. at 18.)

As set out above, the "your product" exclusion excludes property damage to your product that arises out of it.  "The product exclusion is the insurer's attempt to prevent the [commercial general liability] policy from becoming a warranty of insureds' goods, its so-called 'business risks,' as to losses which are normal, frequent, and predictable."  Scott C. Turner, Insurance Coverage of Construction Disputes § 27:1 (2007).

> By its own terms, the product exclusion only applies to . . . "your products" . . .  Thus, property damage to any other property is unaffected by the exclusion.  This is "the very sort of risk for which the policy was written and its premium paid."

A special application of this principle occurs as to property damage experienced by the larger property from the presence of a defective product incorporated into or upon it.

Another form is the property damage to other property that occurs when a defective part necessitates the tearing out of nondefective parts in order to gain access to the defective part in order to replace it. The property damage to the other property may also be the loss of use of the other property which results, either directly from the product's defect or indirectly from the process of removing and replacing it.

Covered damage to the other property often occurs in conjunction with excluded damage to the insured's own product. For instance, where the property damage is to a compound product containing components supplied by the insured and components supplied by others, coverage is available to the insured for the damage done to the components supplied by others.

Id. § 27:8 (footnotes omitted).

Both sides agree that the non-conforming concrete Ready Mix supplied was its "product." Thus, the injury to the concrete is clearly excluded. However, the damage resulting to other property, the loss-of-use damage to the bridge as a whole, and the physical injury to component parts during the removal process, are not excluded. Accordingly, the "your product" exclusion does not, as EMC argues, preclude recovery for the cost of replacement rails and the labor associated with replacing the other parts of the bridge deck damaged in the removal process.

### 3.    Impaired Property Exclusion: Exclusion m

Finally, EMC contends that Exclusion m excludes coverage for the rebar, expansion joint, and labor. In relying on this exclusion, EMC takes the position that the bridge was "impaired property" or property that has not physically injured so as to preclude recovery of consequential damages flowing from the repair and replacement of the non-conforming concrete. The Court is not persuaded.

The damages sought do not fall within the scope of Exclusion m because the bridge was not "impaired property" as defined in the policy and because it *was* physically injured. "Impaired property" is property damaged, because of a loss of use and not a physical injury, resulting from its inclusion of the insured's defective product (or the insured's failure to fulfill a contractual obligation), but which can be restored to use by the replacement or repair of the defective product (or the insured fulfilling the terms of the contract). In this case, the bridge deck was unsuited for use due to the presence of non-conforming concrete, and the concrete had to be replaced for the bridge to be useable. However, merely replacing the concrete would not have made the bridge useable. Other component property had to be replaced as well. Thus, the bridge was not "impaired property" because it could not be restored to use by only replacing the defective concrete.

Similarly, the bridge does not qualify as property that was not physically injured. There was surely physical injury to the bridge during the repair process when other components, not Ready Mix's product, were destroyed.[2]

This outcome comports with Exclusion m's purpose. Exclusion m "narrows coverage for claims involving the reduced usefulness or impairment of property other than the insured's. The exclusion targets situations where a defective product, after being incorporated into the property of another, must be replaced or removed at great expense

---

[2] Ready Mix apparently does not contend that the mere incorporation of the defective concrete into the bridge deck constituted "physical damage." It is not clear that Oklahoma law would support such a theory. See Border Bolt Co. v. Twin City Fire Ins. Co., No. 97-1007, 1998 WL 339689, at *2 & n.1 (10th Cir. Jun. 24, 1998) (unpublished) (rejecting insured's "incorporation" theory under Colorado law).

thereby causing loss of use of the property." Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc., 972 S.W.2d 1, 9-10 (Tenn. Ct. App. 1998). It "bar[s] coverage for loss of use claims (1) when the loss was caused solely by the insured's failure to provide work of the quality or performance capabilities called for by the contract and (2) when there has been no physical injury to property other than the insured's work itself." Id. at 10. The exclusion is not intended to apply to situations "[w]here 'your product' . . . cannot be completely repaired, replaced, adjusted, or removed." Turner, supra, § 26:15. Nor is it intended to apply "[w]here the removal of 'your product' . . . will result in physical injury to the property in question" –that is because "the property is neither 'impaired property' nor 'property that has not been physically injured.'" Id.; see also 4 Bruner & O'Connor, supra, § 11:49 (2007) ("In addition to not applying where usefulness may not be restored by the repair of the insured's work, courts have held the ['impaired property'] exclusion inapplicable where the repair or replacement of the insured's work would cause physical injury to other property.").

The Standard Fire court applied these principles and determined that the "impaired property" exclusion did not exclude damages to other component property destroyed or injured during the removal the insured's defective work. The insured was a subcontractor responsible for the mechanical work on a building construction project and who subcontracted with another contractor to install the ductwork for the building's heating, ventilation, and air conditioning ("HVAC") system. The ductwork proved defective and required the removal of the entire HVAC system. The court determined that the cost to repair damage to the walls, ceilings, and other parts of a building that were damaged by the

removal of the HVAC system were not excluded under the "impaired property" exclusion because "physical injury to other tangible property not part of the insured's work [and] necessarily resulting from the repair or replacement of the insured's work is not excluded by the 'impaired property' exclusion." Id. at 12.

Similarly, here, the cost to replace the rebar, concrete rails, and an expansion joint damaged during the removal of the non-conforming concrete are not excluded under Exclusion m because they were not Ready Mix's product or within the scope of its work.[3]

## CONCLUSION

In sum, EMC has failed to show that it is entitled, as a matter of law, to a declaratory judgment that Ready Mix can recover nothing related to its having supplied defective concrete. For the reasons stated above, the policy provisions identified by EMC do not preclude Ready Mix's claim for reimbursement for the cost of the new concrete rails, expansion joint, and rebar and the replacement labor for those items. Damages for those are recoverable. See Hartford Accident & Indem. Co., 861 F.2d at 253-54. In establishing its damages at trial, Ready Mix will be required to specifically identify what work and property had to be replaced or repaired because of it supplied of defective concrete and the associated costs.

---

[3] The "arising out of sudden and accidental physical injury to 'your product' exemption may also apply here. In Federated Mut. Ins. Co. v. Concrete Units, Inc., 363 N.W.2d 751 (Minn. 1985), the Supreme Court of Minnesota relied on that exemption to the "impaired property" exclusion in a defective concrete case. The court determined that the loss of use of the concrete grain elevator being constructed was due to the "'sudden and accidental physical injury' to the concrete" supplied by the insured. Id. at 757 n.4 (quoting policy). Some of the concrete hardened more rapidly than it was supposed to while other acted as a "'gummy mass'" that allowed holes to open up in the walls. Id. at 753.

Accordingly, Plaintiff's motion for summary judgment and alternate motion for ruling limiting recoverable damages (Dkt. No. 18) is DENIED.  Damages will be determined at trial.  Plaintiff's Motion to Exclude Expert Testimony (Dkt. No. 16) is DENIED as moot because Mr. Combs's opinions relate to coverage only.  Judgment will issue at the conclusion of these proceedings.

IT IS SO ORDERED this 30th day of May, 2008.

ROBIN J. CAUTHRON
United States District Judge